## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 13-24582-Civ-TORRES

MOBILPREF, SpA.,

       Plaintiff,

v.

COASTAL CONSTRUCTION OF
SOUTH FLORIDA, INC. d/b/a
COASTAL CONDOMINIUMS, a
Florida corporation,
and ITAL KITCHEN
INTERNATIONAL, INC. a/k/a
CAPITOL HOLDING, a Florida
Corporation.

       Defendants.

_____/

COASTAL CONSTRUCTION OF
SOUTH FLORIDA, INC. d/b/a COASTAL
CONDOMINIUMS,

       Counter-Plaintiff,

v.

MOBILPREF, SpA.,

       Counter-Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW; FINAL JUDGMENT ON ALL CLAIMS

     This case came before the Court for non-jury trial on October 26-29, 2015,

and January 13, 2016. The parties later filed proposed findings of fact and

conclusions of law for the Court's consideration.  The Court's review of the greater weight of the evidence in the case requires the entry of Judgment for Plaintiff in Part and for Counter-claimant in Part.   This Court's Findings of Fact and Conclusions of Law follow, as well as the Court's resulting Final Judgment.

## I.   FINDINGS OF FACT[1]

### A.   Procedural History

Mobilpref, SpA. ("Mobilpref") commenced this action on January 7, 2014, in a two-count complaint seeking damages for breach of contract and account stated. [D.E. 4].  Mobilpref seeks 240,443.43 euros, approximately $336,620.80 based on the exchange rate it claims was in effect at the time of the project, for the manufacture and sale of kitchen, closet and related materials it delivered without complete payment.  The complaint sought contractual damages from Ital Kitchen International, Inc., a/k/a Capitol Holding ("Ital") and Coastal Construction of South Florida, Inc. d/b/a Coastal Condominiums ("Coastal").   The materials were purchased by Coastal for installation in the St. Regis hotel project in Bal Harbour, Florida ("the Project").

On January 29, 2014, Coastal filed its initial answer and affirmative defenses. [D.E. 10].   On May 16, 2014, Coastal filed an amended answer, affirmative defenses and counterclaim.  In its answer, Coastal admits it did not pay Mobilpref the full contract price but alleges that Mobilpref breached the Parties' agreements by improperly shipping goods, delivering non-conforming goods, and

---

[1] All references to the trial transcript ("T") include the Volume number, page and line(s), i.e., T.I-1:1.  The Court's Findings of Fact are also included in the Court's Conclusions of Law, which are found in the section that follows.

failing to deliver all the goods that were ordered.  Coastal demands judgment in its favor on Mobilpref's complaint.

As for its counterclaim, Coastal admits it has no financial loss arising from Mobilpref's alleged breaches; rather, the counterclaim seeks damages for Mobilpref's breach of contract, fraud, fraud in the inducement, negligent misrepresentation, and unjust enrichment, all under the auspices of an assignment received from its surety (Liberty Mutual).  Coastal demands damages of $1,151,385.91. [D.E. 23].

Mobilpref dismissed Ital from the case on May 18, 2015, [D.E. 55].  After discovery and motion practice, the complaint and counterclaim went to trial before the Court (as the parties had contractually waived their respective rights to a jury trial).  This case came up for non-jury trial before the Court on October 26-29, 2015, and concluded on January 13, 2016.  After an opportunity to review the transcript of the trial, the parties submitted their proposed findings of fact and conclusions of law for the Court's consideration.  As the Court found that neither party's proposed findings could be adopted without material modification, the Court prepared its own findings after thoroughly reviewing the available transcript and the documents submitted in evidence.

### B.    *The Project*

This case arose from the construction of the St. Regis Hotel in Bal Harbour, Florida.  St. Regis was a high-end luxury hotel and condominium project for Starwood, a hotel and resort conglomerate ("Starwood" or "owner").  Coastal was

selected by Starwood to serve as general contractor for the construction of a multi-million dollar hotel and residential complex across from the Bal Harbour Shops.

Bill Ford was a vice-president of Coastal and designated as Coastal's corporate project executive in charge of the Project. Ford had overall responsibility for all aspects of the Project. Ford was Coastal's primary contact with Starwood as well as with Coastal's many subcontractors on the Project. Coastal had between 60-80 subcontractors on site at any given stage of the Project.

Coastal's scope of work included custom-made kitchens and closets for residential condominium units having sale prices exceeding $1,000,000. Starwood requested that Coastal obtain a bid from Italkitchen International, Inc. ("Ital"), along with several other cabinet subcontractors, for the cabinet supply and installation that would utilize high-end Italian-made materials. The subcontract required the manufacture, delivery, fabrication and installation of cabinets and closets for the residences. DX 2.

For that purpose, Coastal selected Ital for the project. On October 22, 2008, Coastal entered into a written subcontract with Ital for $13,625,000 to provide and install the custom kitchens and closets. DX 2.

Liberty Mutual Insurance Company ("Liberty Mutual") provided payment and performance bonds for Ital on the Project as required by the subcontract. Liberty Mutual assured Ital's performance of the work and payment of its subcontractors and suppliers. DX 19.

The initial subcontract included cabinets for 268 units. T.II-277:22-25. This subcontract included kitchenware that which Starwood planned to provide with the

units.  But, due to the deterioration of the real estate market, Starwood decided not

to finish 50 units.  Coastal also removed the kitchenware from the subcontract,

thereby reducing the number of units to 218 and the subcontract price to

$9,414,061.79. DX 3.  Ultimately, through other revisions, there were 216 units

which were to receive kitchens and closets under the Ital subcontract.  T.II-290:1-4.

### C. *Mobilpref Contract & Commencement of Work*

To satisfy its obligations to Coastal, Ital contacted an Italian company,

Mobilpref, to manufacture and deliver the kitchen and closet component parts to

Miami, Florida.  Ital and Mobilpref had worked together on other projects before.

This arrangement contemplated that, after delivery, Ital was obligated to affix the

necessary hardware, assemble the component parts, and install the completed

assembled cabinets in each unit in the Project.  The price of the original order for

the goods purchased and ordered by Ital was 1,787,797.89 Euros.  DX 26.

Under its contract Mobilpref agreed to receive the orders and technical

drawings from Ital and produce the goods in accordance with those drawings and

orders.  Mobilpref was also required to prepare the goods for shipment to Miami.

Ital (and later Coastal) made all arrangements for shipment and paid directly for

all shipping and delivery to the Ital warehouse in Miami, Florida.  T.I-9:1-10.

Mobilpref's proformas and invoices set forth the terms of purchase and

include an "Ex Works" clause.  PX 21, 26.  The "Ex Works" clause means that the

producer, MobilPref, is responsible for the manufacture of the goods.  All shipping,

assembly, installation and related matters are the responsibility of the customer

(here, Ital and later Coastal).  T.I-15-16.

Coastal planned for Ital to begin receiving Mobilpref's materials in the fall of 2010, as required by the Project's overall schedule.  The cabinets came with various options to be chosen by the ultimate unit purchaser or Starwood.  There were seven selections of hardwoods, including exotics, for the kitchens and the closets.  If the units were not sold by a certain date, Starwood would make the selections for the unsold units in order to maintain the schedule.  The plan contemplated that the cabinets would be installed as the work moved up in the building, in a sequential fashion.

Specifically, the luxury-priced kitchens and closets were made up of a great number of parts and components, with the complexity multiplied by the number of unit owner selections in the kitchens and the closets.  With 216 units, 7 possible kitchen veneer selections in two finish selections (matte and high gloss), and 7 closet selections in two finishes, the permutations and combinations for that many units were extensive.  The unit purchasers were to be given an option of seven (7) different species of exotic woods to choose from, in either a gloss or matte finish. Thus, there were fourteen (14) possible combinations available to the purchasers.

Further, different parts of the closets were made of different types of materials as well.  The higher end "showy" part of the kitchen and closets that were visible, i.e., doors, panels, etc., had to be veneer-faced, medium density fiberboard (an engineered wood product) with the veneer finish as specified by the unit purchaser.  All of the different component parts had to be coordinated for every kitchen and closet component to match.

The "boxes" for the kitchens and closets were all to be made of melamine, i.e., an engineered wood product. This is a generic material but comes in different finishes that had to be coordinated with the unit selections. The boxes formed the backbone of the cabinets to which the veneered products were applied to give the impression of a solid wood cabinet. However, some of the melamine materials had to have veneer applied to maintain the illusion of a solid wood product.

Needless to say, this was a complex order. The full cabinet installation was estimated to take approximately eight (8) months, with an initial completion date in the summer of 2011. And this complex order was essential. The kitchen and closet cabinets had to be installed before Starwood could close on the condo units with the required certificates of occupancy.

Coastal provided Ital with its initial unit wood selections by June 2010, anticipating that Ital would then commence the manufacturing and delivery process. For that purpose, Ital received a deposit of $3,000,000 under its subcontract with Coastal. T.II-293-2:6.

### D.   _Ital's Failure to Perform Leads to Delayed Production_

By September 2010, Coastal was expecting to see initial cabinets and materials arriving at the Project site. Ford had anticipated the typical lead time on such an order was 90 days from material selection to arrival of first materials. T.II-297:23-25, 298:1-2. That did not happen, however. Coastal raised its concerns with Ital, who assured Coastal that its work was proceeding as planned. In truth, however, Ital at that point in time was encountering financial hardships that were

interfering with Ital's work on this Project.  Ital was thus not making the required payments to Mobilpref to begin manufacture and delivery of the cabinets.

For its part Starwood also grew concerned that Ital was not performing.  Its project executive suggested a visit to Italy to meet directly with representatives of Ital and Ital's supplier (which Coastal later learned to be Mobilpref).  A visit to Ancona, Italy – where Mobilpref was based – was planned for September 2010 at which time Coastal could verify the manufacture of the cabinet materials. Starwood wanted to verify that Ital had secured the veneer raw product for fabrication of the materials selected.  Ford was thus tasked to go to Italy to meet with Ital's supplier – Mobilpref – to see the progress being made toward the delivery of the cabinet components he had been told were being manufactured there.

That first visit to Ancona, Italy took place that September.  In attendance for Coastal were Dan Whiteman (Coastal's president), who testified, Donald Whiteman, an assistant superintendent on the Project, and Ford.  Starwood's project manager, Fordsman, attended as the owner's representative. Ital's principal, Ted Planton, also made the trip. This delegation met with Giancarlo Pierdicca, Mobilpref's owner, and Gerry Talozzi, who testified at trial as Mobilpref's corporate representative.  Talozzi played a central role.  Talozzi testified that he represented several Italian companies, including Mobilpref, under what he described as an "agency" relationship where he would promote a company's business and try to sell their materials outside of Italy. At the time of the Project, Talozzi had worked with Mobilpref on about 15 other projects.  T.I-

7:21-24.   As he was the primary Mobilpref representative who spoke English, Talozzi was the sole point of contact for Coastal and acted as Mobilpref's agent in its work on the project.

Again, the purpose of the meeting was to confirm that Mobilpref had the capacity and the commitment to produce the cabinets for Ital and the Project.  The attendees learned that Mobilpref was a "melamine" shop and only had the equipment to manufacture the "boxes" portion of the kitchens and closets, not the high-end veneered parts (the panels, doors and other visible component parts). Mobilpref subcontracted out the veneered wooden panels and door components of the kitchens and closets to GFL, another Italian cabinet company based near Ancona.

Thus, the component parts of the kitchens and closets to be shipped to the Project were going to be the combination of the materials manufactured at Mobilpref's factory, GFL's factory and, later on, two other veneer shops at different locations, which were then to be shipped separately in shipping containers to Ital in Miami.  Mobilpref represented that it had the systems in place to coordinate all of these material sources and parts and components so that the materials arrived in such a way that they could be assembled either in the Project or at Ital's warehouse.

Talozzi touted, in particular, Mobilpref's use of a flat-packing process to make it easier to assemble the component parts once they arrived at the project. Talozzi explained how the packaging would be set up by unit for the kitchens, by

unit for the closets, and they would be sent in "flat packs," which would be identified on each package what they were for.

Coastal and Starwood's representatives were disappointed, however, that they did not see evidence of manufacturing of St. Regis components while they toured the Mobilpref factory. They were expecting to see fabricated panels, fabricated doors, or some type of finishing work in process, but they saw none of that.

They thus left the meeting in Italy still concerned that Ital and Mobilpref would not be able to deliver despite the subcontractors' assurances. They had reason to be concerned given that Mobilpref itself was relying on its own suppliers to deliver complete kitchen and cabinet components.  And Coastal learned on that trip that Mobilpref's factory only produced the melamine boxes that, without the remaining components, would not satisfy Coastal's needs.

By that point in time (September 2010), Coastal had already made deposits to Ital under the subcontract.  Coastal had no intention of making any further payments to Ital until their product started arriving at Ital's local warehouse in Miami.  By the time Coastal and Starwood returned to Miami, materials had still not been shipped.

In October or November 2010, Platon from Ital claimed to Ford that the first container was on its way.  Ford went to Ital's warehouse in Miami when Platon told him that a shipment for the Project had come in, but when Ford arrived he found only cabinet parts for another project.   No St. Regis product was evident.

Ford by this point was fully aware of Ital's failure to perform, which was consistent with Starwood's growing concern that Ital's financial condition was jeopardizing the project. After Ford confronted Ital about its failure to perform, Platon put Ford in touch with Talozzi, who told Ford that Mobilpref had not yet received its payment to begin shipping materials. T.III-359:9-15.

For its part, Mobilpref insisted on payment of $1,500,000 before it would commence production of the materials for the Project. Talozzi claimed that a deposit payment of $200,000 was still due and owing. At the same time, Mobilpref and Ital refused to disclose to Coastal the precise terms of their deal, i.e., the total value of the materials that Ital had ordered from Mobilpref and the exact list of the pieces to be supplied by Mobilpref. Ford was told, instead, that if Coastal paid the $1,500,000, Coastal would receive the ordered materials.

By this point, both Coastal and Mobilpref were thus fully aware that Ital's financial problems was hampering its performance under the contract. Accordingly, Coastal put Ital's performance bond surety, Liberty Mutual, on notice of a possible claim based on the issues it was having with Ital. T.IV-589:12-20. Coastal's knowledge that Ital would likely breach its contract was not enough for it to cancel it and retain a replacement cabinet subcontractor. But this was not a viable option, as Ford explained, because shop drawing submittals, material selections, and measurements had already been prepared and would likely have to be redone. Ford decided that, as a result, Coastal would have to find some solution with Ital. That solution required Coastal to step in and deal directly with Mobilpref.

### E.  *The Tri-Party Agreement – December 20, 2010*

Ultimately, on December 20, 2010, Coastal, Ital and Mobilpref entered into a "Tri-Party Agreement" under which Coastal was to make the $1,500,000 in payments directly to Mobilpref in order to receive all of the kitchen and closet materials from Mobilpref (with a resulting credit against the balance of Ital's subcontract).  PX 1; DX 4.

Ford's intent was that, if Coastal fronted the $1,500,000 to Mobilpref for the kitchen and closet materials, Ital would at least be able to complete its own scope of work under the contract – receiving, sorting and assembling the delivered materials for installation at the St. Regis project.  Based upon Ital's and Mobilpref's assurances, Ford hoped that all of the dates for the shipment and delivery of the materials per the Tri-Party Agreement were achievable.

The Tri-Party Agreement provides that Coastal was to receive all of the materials (which at the time included 204 kitchens and 202 closets) for payment of $1,500,000 and that Mobilpref would look *only* to Ital for any balance remaining due for production of all the materials:

> Whereas, Mobilpref has a separate Agreement with Ital to manufacture and delivery [sic] the cabinets to Ital for fabrication and installation, and
>
> Whereas, the Subcontract Agreement between Coastal and Ital provides for payment of materials only upon their delivery and storage in Miami, Florida, and
>
> Whereas, Mobilpref and Ital have jointly requested that certain advance payments be made directly to Mobilpref for the above cabinets, and wish to keep the terms and details of their separate agreement confidential between their organizations, and

Whereas Mobilpref has agreed to remain open and in full production of the cabinets without any interruption of manufacturing during the Christmas and New Year Holiday Season, and

Whereas time is of the essence is assuring the timely completion of the Project, and

Whereas Coastal, in exchange for the acceptance of this Agreement by Ital and Mobilpref is prepared to make certain advance payments provided certain conditions of manufacture and delivery are met, the following represents the terms of this Agreement:

1. Ital and Mobilpref agree that Coastal shall only be responsible to make payments to Mobilpref for the payments outlined below and that any further payments that may now be or become due to Mobilpref in excess of the following will be made solely by Ital, and Coastal shall have no responsibility now or in the future for any such payments.

2. Coastal agrees to make direct payments to Mobilpref by wire transfer in the following amounts, with a simultaneous acknowledgement by Ital that any such payment is an equal reduction in the balance of the Subcontract amount between Coastal and Ital, based upon confirmation of the fulfilment of the agreed upon manufacture and shipping dates of the components outlined herein . . . .

PX 1 at 1-2.

The balance of Item 2 of the Tri-Party Agreement specified five total payments for a total of $1,500,000, with the final payment due after shipment of all materials by February 28, 2011. This condition was consistent with the overall scheduled completion date for the kitchens in July-August 2011 and the closets by September-October. T.III-375:20-25. Hence, all parties to the Tri-Party Agreement agreed that "time was of the essence."

While the Tri-Party Agreement expressly referenced the existence of an undisclosed balance that Ital would still owe Mobilpref, Coastal was not privy to

that information.  Only Ital and Mobilpref knew that amount.  Ford never saw the original pro forma before Coastal entered into the Tri-Party Agreement.  But Coastal entered into the Agreement anyway with the intent and expectation that Ital and Mobilpref would perform their obligations under the Agreement and Ital's subcontract. T.I-15-16.

### F.    *Problems and Delays in Early Installation*

With the Tri-Party Agreement in place, Coastal began making its first installment payments directly to Mobilpref, which in turn started shipping containers of materials from Italy in January 2011.  T.III-376:15-25.  But as the containers for the kitchens started to arrive at Ital's warehouse, they were not being timely assembled by Ital personnel.  Under the Ital contract, Ital was responsible for assembling the offloaded materials and preparing them for installation at the project location.  But that did not happen, in part due to the manner in which Mobilpref began sending the materials.  Mobilpref did not ship closet-specific flat-packs as Coastal expected; instead, Mobilpref's initial shipments were organized by the *type* of component part, i.e., a series of end panels for multiple units and not by unit. But the underlying contract documents ultimately placed the responsibility of assembling the shipped materials at Ital's doorstep. Ital could not do so.

The problems evident in the early part of 2011 led Coastal to begin taking over management of the Ital subcontract. Coastal began directing the operations at the Ital warehouse facility in Miami and on the Project's jobsite.  Coastal installed its own staff at the warehouse and hired Tom Driscoll Installations, Inc. to manage

Ital's entire scope of work. Coastal's in-house financial staff also took over all payments for Ital's vendors, suppliers, staff and overhead.  Driscoll started working on the Project in approximately the second week of February 2011.  T.IV- 681:20-22.  Coastal could no longer afford to let Ital languish while the work on the project got delayed.

But Ital's failure to properly assemble the units created even further delays, especially for the closet installations.  Ital (and then Coastal) had to sort the materials at Ital's warehouse to locate the different component parts (which in many instances came on separate containers) to accumulate the product needed for a single unit.  To compound matters, Talozzi admitted that the veneered doors were packaged separately from the other materials by Mobilpref's veneer shop subcontractor, GFL.  And GFL did not flat-pack the doors in the way that Talozzi had claimed.  Moreover, the parts were either poorly labeled or not labeled at all, which made it difficult to efficiently assemble the parts for installation of a closet in a unit.

Upon arrival at the site, Driscoll familiarized himself with the current status by reviewing the status of the installations in the units at the Project.  Driscoll testified that during the first two months he was on site (February and March 2011), the work focused on installation of the kitchen "boxes" in the units that would ultimately receive the veneer door panels and other necessary veneer component parts.  Driscoll testified that in early February, he was trying to get the "kitchen program up and running" and the next step would be to start the closet

program.  T.IV-689:10-15.  But the closet program was hindered because there was "simply not enough material there."  T.IV-689:1-4.

### G.    *Amendment 1 to Tri-Party Agreement – April 2011*

By mid-March 2011, Coastal had just made a large payment of $500,000 to Mobilpref and had only one payment of $250,000 remaining to Mobilpref under the Tri-Party Agreement.  Yet, despite the shipment of materials that were received to date, the quantities did not add up because many more materials were necessary for completion, especially for the closets. Ford wanted to find out what was going on before Coastal made the last $250,000 payment.

Talozzi travelled to Miami from Italy in March 2011 to meet with Coastal on that issue.  Ford picked Talozzi up at his hotel en route to dinner with Whiteman and Platon.  On the drive, Talozzi told Ford for the first time that Coastal would have to pay Mobilpref an additional 590,000 Euros before Mobilpref could ship the remaining materials. T.I-27:4-7, 28:1-13.  Ford was not happy.

When Ford confronted Platon of Ital about this problem, Platon conceded that the $1,500,000 in payments would not be enough.  And while Talozzi and Platon agreed that Coastal was supposed to receive the balance of the product for the units for the $1,500,000 required by the Tri-party Agreement, Ital claimed it did not have the funds to pay the rest of the order.

After that meeting, on March 30, 2011, Ford sent an email to Platon and Talozzi (PX 6):

> As agreed today we are making the final $250,000 payment on the original Tri-Party Agreement based on manufacturing progress to date.  In order for Coastal to make the additional payments requested

beyond this amount the Tri-party Agreement will need an extension/amendment to incorporate these additional payments Coastal has been asked to make on Ital's behalf. We will prepare and forward this amendment in the next few days.

I would also note that an additional order has since been placed to Mobilpref in the amount of $38,890 for the 6,500 puck lights, and per Ital's request we are paying this amount as well, and will include it with the $250,000 payment wired today.

Talozzi responded to Ford's email on April 5, 2011, confirming that Mobilpref had "received the last wire for $250,000 US Dollars as per the original Tri-Party Agreement." He also attached a schedule to his email, which reflected Mobilpref's receipt of full payment on the original Tri-Party Agreement, as well as the additional $38,000 for the puck lights referenced in Ford's initial email, but which also reflected a 608,563 euros balance on Mobilpref's original pro forma with Ital – the balance of the original order.

In connection with the "extension/amendment" which Ford said would be necessary before Coastal would pay more money, Ford (now with Driscoll) went on a second trip to Mobilpref's factory in Ancona, Italy. The purpose of this second trip was to ensure that if additional monies were paid then Coastal would in fact get all of the materials needed to complete the Project. T.III-389:9-19.

In Italy, Ford met with Talozzi and developed what would become Amendment No. 1 to the Tri-Party Agreement (hereinafter "Amendment 1"). PX 2; DX 5. Amendment 1 provided that Coastal would make the remaining payments due to Mobilpref, addressed modifications to the cabinets and related products to be provided by Mobilpref, and added a few new products to be purchased. Amendment 1 also included a retainage provision of 160,000 Euros to the payment

terms as an incentive for Mobilpref's timely performance of its contractual obligations.

Specifically, Amendment 1 provides, in relevant part:

(1) It is agreed that the total outstanding amount to be paid on the Current Order (the Balance) for the items generally described herein is 590.000,00 Euros, to be adjusted per the exchange rate in effect at the times the remaining payments are made.

(2) Payments for the Balance are to be made as follows:

A.   Coastal will wire transfer to Mobilpref $300,000.00 within 3 days of shipment of 2 additional containers (containers 22 and 23).

B.   Coastal will wire transfer to Mobilpref an additional amount of $333,000.00 within 3 days of shipment of all remaining parts required to complete the Current Order.

C.   The balance remaining will be withheld as Retainage to be paid by Coastal to Mobilpref within 45 days of delivery to Miami, Florida of the final shipment(s). Within this 45 day period Ital and Coastal will confirm that all parts were *properly manufactured and delivered* or shall provide a list to Mobilpref of any parts that may be defective or missing, which parts shall be furnished or replaced by Mobilpref and delivered to the shipper. Two times the value (as reasonably determined among the parties) of any such parts, if any, that have not been received in Ital's warehouse within this 90 day period shall be withheld from the final payment of the Retainage, which amount, if any, shall be paid within 14 days of receipt of these parts.

PX 2 (emphasis added).

Coastal entered into this modification of the Tri-party agreement despite grave misgivings about the status of Mobilpref's production.  For instance, Talozzi took Driscoll to GFL's location, where Driscoll was hoping to see what raw materials GFL had on hand for the veneer work.  The answer was, not much. Based on what Driscoll saw at GFL, he had the impression that GFL had just started production that morning.  Further, Driscoll determined that the original

Ital order of 204 kitchens and 202 closets was short and that in fact 216 units were needed. This is why Amendment 1 specifically referenced 204 kitchens/202 closets, because the intent was to submit an additional order to Mobilpref for the additional 12 units. T.III-395:18-25, 396:1-9.

Nevertheless, Amendment 1 was finalized and Ford left Italy. Driscoll stayed behind to try to pin down the materials that had been shipped and what remained to be shipped, in the hope that he could rectify the existing inability to fully complete any single unit due to lack of parts. Ford left Italy thinking that finally the situation was in hand (albeit, at the price of an additional 590,000 Euros). Indeed, Mobilpref was bound to complete all its work on the original order after Amendment 1. T.I-32:10-12.

With Amendment 1 in place, Coastal made the initial payment ($300,000) and started receiving additional containers. As the additional containers arrived, however, Coastal continued to find problems with the manner in which the materials were shipped, as well as missing components particularly relating to the veneer components. But Driscoll realized in his trip to Italy that delays with the veneer products were inevitable given how they were being processed by Mobilpref's suppliers. Specifically, Driscoll learned that matte finished veneer products would be shipped from Mobilpref's location, while the high-gloss veneer shop (250 miles away) would be loading and shipping its products from that location. T.IV-705:1-25.

As Driscoll feared, as of April 2011 there was still not enough product to finish any single unit in the project. The continuing issues Coastal was having led

to Talozzi and Gianfranco Pierdicca traveling to Miami.   During that trip, Mobilpref made further assurances that it would timely complete its work required by Amendment 1.   Coastal then made the second payment of $333,000 under Amendment 1.

But, at this point Mobilpref had clearly and expressly been placed on notice that these continued shipment problems could lead to Coastal charging back monies from Mobilpref, both through Driscoll's communications with Ital and Mobilpref, as well as what was in effect a "demand" from Ford that Mobilpref cure its failure to timely perform. DX 28.

### H.    *Third Trip to Italy and Amendment 2 to Tri-Party Agreement*

During Ford and Driscoll's trip to Italy in April 2011 to work on Amendment 1, Driscoll discovered that the original pro forma between Ital and Mobilpref was missing 12 units of materials.   Driscoll went to Italy to develop that order in May 2011, as well as inspect the status of production of the materials previously ordered.   When he arrived, he observed that Mobilpref was still in the midst of producing those materials.   He also reiterated to Mobilpref how difficult it had been to complete a unit based on the manner in which the goods were shipped and the delays in producing all the necessary parts.

Driscoll's May 2011 visit led to the creation of Amendment 2, DX 32, which followed Mobilpref's pro forma for additional parts that were ordered to complete the project.   Mobilpref's initial price for the pro forma was 287,000 euros.   Driscoll reviewed the pro forma and removed some items, particularly attic stock, to bring

the price down to 155,000 euros.  Talozzi eventually agreed to 165,000 euros price (or about $226,000).  That order and price was memorialized in Amendment 2.

Talozzi and Mobilpref denied the existence of any such formal Amendment to the original contract, in part because an executed copy of the agreement signed by all parties (not just Ford from Coastal) was not introduced into evidence.  But the great weight of the evidence admitted at trial proved otherwise.  Talozzi's testimony in this respect was not credible, while Ford's testimony on the subject was entirely credible.

In addition to that credibility finding, written evidence of the parties' agreement to enter into Amendment 2 also is found in the record.  Talozzi communicated in writing with Ford and others after the Italy trip that he had received the final version of the Amendment and submitted it to Mobilpref. DX 33. Talozzi later confirmed in writing work had begun on manufacturing the ordered materials and, later, receipt of the wire of the final payment of those materials. DX 43.

Coastal ultimately paid Mobilpref the 165,000 euros (in two installments) for all the materials ordered and incorporated into Amendment 2. T.I-92:7-12.  Such payments were received and acknowledged by Mobilpref.  Therefore, the great weight of the evidence supports the existence of an enforceable agreement in this respect.

## I.   *Mobilpref's Completion of Contract and Claim for Payment*

During the summer 2011, shipments continued but so too were Coastal's difficulties in completing the units.  At trial, Talozzi admitted that by June 2011

there were still kitchen cabinets from the original order that had not yet shipped. T.I-126:2-22.

The delays in delivery of all the required components led Coastal to set up a "cabinet-making shop" in the garage of the Project. That effort involved bringing in machinery, procuring materials locally, including exotic veneer materials, to produce the parts that they were not receiving from Mobilpref because of an upcoming deadline for the Temporary Certificate of Occupancy (TCO) for the Project. Driscoll provided samples of all of the seven different wood species to South Florida supply houses to prepare the proper tints necessary to finish the veneered components. This effort also provided Coastal a means to re-finish non-matching materials that Mobilpref had provided.

By August 11, 2011, Dan Whiteman again got involved and emailed Talozzi after Coastal received notice that Container #35 was being shipped, inquiring as to whether a) Container #35 was the last container and; b) whether it completed the order. DX 35. Talozzi's responded five days later that there were still parts that were missing and that an additional container would be required after August.

Ford confirmed that container #35 did not include all the components necessary to complete the order. It was at this time that Ford approved only 100,000 euros to be paid of the 165,000 euros due under Amendment 2.

On September 13, 2011, Ital sent Talozzi a detailed breakdown of all of the missing doors and panels still needed to finish the job. Per the three agreements, all of the materials had been purchased by Coastal, some arguably multiple times. It was a large list of about 800 veneered door panels for the kitchens. Talozzi

admitted that he received the list.  T.I-141:25, 142:1.  These door panels were not necessarily additional materials that Coastal was ordering for the first time in September.  They were panels that were included in the original order and its amendments.   But some portion of that order may have included new or replacement materials that were required to finish the job. But the Court cannot find without speculating what percentage were new versus what percentage were items missing from the original order.

By September 20, 2011, Talozzi was emailing Ford and advising that "the only material left to be shipped are the 2 custom units secondary closets S-110 and S-1201.  We are shipping these with the remaining attic stock required – wood panels pre-finished which are coming ready too. . . . Gianfranco [Pierdicca] will be the best person indicated to come and assist you on sorting out all the missing.  Let me try to get this organized and then I will let you know."  DX 43.

On September 21, 2011, Coastal initiated and approved the wire for the final 65,000 Euros ($89,114.90) and paid Mobilpref in full for Amendment 2 to the Tri-Party Agreement.   Ford conceded that Coastal received all the materials for the extra units under Amendment No. 2. From his point of view, the only open payment issue was the retainage left on the 590,000 Euros in Amendment 1, which was approximately 130,000 – 135,000 euros.  This amount was not disbursed because Coastal had not yet received everything it had ordered.[2]

---

[2]     While Talozzi testified that the retainage on Amendment No. 1 was "around 160,000 euros," Ford testified that he calculated it somewhere 130,000-135,000 euros based upon an exchange rate of the time.

In September and October, Coastal continued to demand that all the remaining doors and parts be delivered.   But as of November 1, 2011, kitchens and closets were still incomplete due to a lot of parts and pieces missing.   Some units were getting punched out, others getting completed, and others getting ready for unit owner walk-throughs for those closings. But some units were only partially completed and some units were missing a lot of parts.

On November 1, 2011, Ford emailed Platon (and copied Talozzi) advising that Coastal was going to have to procure the doors locally, as "Mobilpref is going to be too late. . . . As you know, we have to be 100% done by the middle of the month."  DX 54.  Two days later on November 3, 2011, Talozzi was still asking whether the material that Coastal is waiting on has to be shipped "finished or unpolished."  DX 53.  Clearly, Talozzi's response revealed that the missing doors were not arriving any time soon.  Coastal then decided to procure the doors locally.

Later, on December 20, 2011, Talozzi emailed Ford asking "will the doors we made be useful for you at this point.  Can we ship them at all?"  DX 57. By that point, Coastal was installing the substitute doors that it manufactured locally.

After some time passed, on October 11, 2012, Mobilpref sent Coastal a demand letter seeking 160,000 euros.  Coastal refused.  Mobilpref filed suit in January 2014, nearly three years later.  Mobilpref's breach of contract claim at trial was based on Coastal's failure to pay: (1) 160,000 Euros due for the retainage amount held back under Amendment 1; and (2) the balance of 80,243.43 Euros due for the additional orders related to the 15 additional units and "extra orders" that Coastal made in the fall of 2011.  Based on the agreed exchange rate at the time of

the construction of the Project, the total unpaid balance due, according to Mobilpref, is $336,340.80.

### J.     Coastal's Claim Against Ital's Surety

At the conclusion of the Project, Coastal submitted a claim to Ital's Surety, Liberty Mutual, for $1,900,000.00 seeking damages allegedly caused by Ital's non-performance of its contractual obligations.   Coastal ultimately settled its surety claim and received $1,700,000.00. T.III-526:1-18; T.V-961-62; DX 14.  By making payment of the Ital claim to Coastal, Liberty Mutual became the owner of any claim that Coastal had against Ital or any of Ital's subcontractors who contributed to that claim, i.e. Mobilpref.  Liberty Mutual then assigned its rights against Ital and those subcontractors back to Coastal.  DX 18.

As Liberty Mutual's assignee of Coastal's claim against Ital, Coastal is the current holder of the rights to sue for subrogation arising from the payment of the claim against Ital, which includes the right to seek damages for contribution on Ital's behalf.

### K.     Coastal's Claim Against Mobilpref

Coastal concedes that Mobilpref performed the lion's share of Ital's subcontract, which required it to produce the materials for the kitchen and closet cabinets for the Project.   But Coastal alleges that Mobilpref "poorly" performed that obligation, which materially contributed to Ital's own default of its

subcontract with Coastal. Coastal allocated $1,151,385.91[3] of the original $1,900,000 performance bond claim to issues proximately caused by Mobilpref's breach of its agreements with Coastal on the Project.

## II.  CONCLUSIONS OF LAW

### A.  *Mobilpref's Breach of Contract Claim*

The pleadings in the case require the Court to determine whether Coastal or Mobilpref (or both) breached the parties' agreements, as set forth in the Tri-Party Agreement and its two amendments. We turn first to Mobilpref's complaint. Mobilpref takes the position that it fully performed by supplying all the materials ordered, while Coastal failed to make full payment. Mobilpref seeks damages in the case based on a breach of contract claim governed by Florida law.[4]

"Under Florida law, a breach of contract arises when there exists (1) 'a valid contract'; (2) a 'material breach' of that contract; and (3) resulting 'damages.'" *Energy Smart Industry, LLC, v. Morning Views Hotels—Beverly Hills, LLC,* 660 F. App'x 859, 862 (11th Cir. 2016) (quoting *Beck v. Lazard Freres & Co., LLC,* 175 F.3d 913, 914 (11th Cir. 1999)); *Havens v. Coast Florida, P.A.,* 117 So. 3d 1179, 1181 (Fla. 2d DCA 2013) (same).

There is no dispute that Mobilpref proved that it originally entered into a valid contract for the sale of goods with Coastal, the Tri-Party Agreement. That

---

[3] DX 61 identified $1,208,884.09 in claimed damages; however, at trial Coastal reduced that amount by the amount of the Drawer Hardware costs ($57,498.18) and dropped that portion of the claim, leaving the revised claim of $1,151,385.91.

[4] Mobilpref also pleaded an account stated claim in the original complaint but did not press that theory of recovery, separate from the underlying contract claim, either in the pretrial stipulation or in its post-trial submission.

agreement required payment from Coastal in exchange for Mobilpref manufacturing and shipping materials ordered by Ital.  Timely compliance was a material term of that agreement, as the parties agreed upon a time is of the essence provision.

It is also undisputed that the Tri-Party Agreement was supplemented and modified by Amendment 1, which required additional payments from Coastal in exchange for Mobilpref's completion of its obligations under the original agreement, plus additional product ordered by Coastal.  That modification also expressly included a timely condition precedent to final payment that required timely and complete performance by Mobilpref.

The greater weight of the evidence also showed that Mobilpref and Coastal entered into a second modification of the Tri-Party Agreement's – Amendment 2 – that constituted an additional order for more materials and parts necessary to complete the project.  Amendment 2 constituted a purchase agreement for specific materials that Coastal ordered (and agrees that it received) in addition to those encompassed by the original agreement or Amendment 1.   While Mobilpref disputes that it agreed to provide the totality of the materials listed on the itemized list attached to Amendment 2 as part of the contract, the Court finds that Mobilpref did in fact agree to satisfy that order and for amount – 165,000 euros (or about $226,000 based on the currency rate at the time).

The crux of the dispute centers on whether Coastal breached these written agreements in failing to make the final payment to Mobilpref.  The evidence reflects that Coastal paid Mobilpref $1,500,000 under the Tri-Party Agreement,

plus $633,000 under Amendment 1.  Coastal also paid $226,000 for the parts and material ordered through Amendment 2.  Altogether, Coastal made direct payments to Mobilpref (separate and apart from any funds originally disbursed to Ital at the inception of the project) in the amount of $2,359,000.

But Mobilpref still alleges Coastal breached by not making full payment for all the materials shipped under these agreements.  Specifically, Mobilpref seeks (1) 160,000 Euros remaining due under Amendment 1 for the retainage amount held back by Coastal; and (2) the balance of 80,243.43 Euros due for the additional orders related to the 15 additional units and "extra orders" that Coastal made in the fall of 2011.

Coastal argues in response that it did not breach the agreements – Mobilpref did. Mobilpref's breach of its agreements for timely and complete performance excused Coastal from further performance, i.e., disbursing the retainage amount set aside by Amendment 1.

The retainage amount is created and governed by Paragraph 2(c) of Amendment 1:

> The remaining balance will be withheld as Retainage to be paid by Coastal to Mobilpref within 45 days of delivery to Miami, Florida of the final shipment(s).  Within this 45 day period Ital and Coastal will confirm that all parts were properly manufactured and delivered or shall provide a list to Mobilpref of any parts that may be defective or missing, which parts shall be furnished or replaced by Mobilpref and delivered to the shipper.   Two times the value (as reasonably determined among the parties) of any such parts, if any, that have not been received in Ital's warehouse within the 90 day period shall be withheld from the final payment of the Retainage, which amount, if any, shall be paid within 14 days of receipt of these parts.

This provision calls into question whether Mobilpref did, in fact, deliver all of the materials required by the original Tri-Party Agreement and its two amendments.  On this issue, the circumstances surrounding the September 13, 2011, Ital door order and the events that followed are telling.  Coastal laid the predicate at trial and elicited from both Talozzi and Ford the procedures that Mobilpref and Coastal used for "extras" on the Project.  Coastal would provide an order, Mobilpref would prepare a pro forma for review with pricing, Coastal would review the order and if acceptable, Mobilpref would provide an invoice for payment to Coastal and require payment before the materials were shipped.

While Talozzi claimed that the Ital door order constituted "extra" materials, the parties' course of performance for extras was never put into place for the door order.  Ford testified that the door order was in fact a "list" of all the missing parts and pieces that Coastal needed to finish the Project.  The email from Gustavo Aristia at Ital to Talozzi transmitting the door order simply states:  "Please find attached the doors & panels orders needed to complete the job."  There is no correspondence or communications between the parties, from that September 13th Ital email through the last email between Ford and Talozzi on December 20, 2011, that contain *any* indication from Talozzi that he considered the door order to be an order for extra materials.  To the contrary, the communications during this time period show Coastal's urgent need to obtain the missing materials as quickly as possible for their efforts to finish units that were rapidly approaching closing dates.  It is also telling that during this time period, Talozzi made no mention of any monies due from Coastal relative to the door order.  Instead, the only reference to

monies owed during this time period occurred on September 15, 2011, where Talozzi advised Ford that, "[d]uring the next weeks, I would like to start [to] discuss with you the 150,000.00 euro as retainage."  DX 44.[5]

There is no mention of any additional billing for the door order.  Indeed, Talozzi confirmed on cross-examination that the doors were in fact never shipped nor ever invoiced. T.II-195, 206.  The record contains further support for that conclusion:  On October 26, 2011, Ford emailed Talozzi and said:

> I understand you have approximately 800 kitchen doors that will be ready to ship 1st week of November, based on an order sent from Ital several weeks ago.  I will need to air freight these doors in order to complete the units for turnover to the Owner which is scheduled for mid-November.
>
> Please confirm whether this is correct and advise of any requirements you may have in order to release these doors for shipment.

DX 50.

Talozzi did not respond to Ford's email with any requirements that Mobilpref had in order to release the doors for shipment.  Mobilpref never sent Coastal a pro forma for the door order.  Despite promising that the doors would be available the "first [week] of November," Talozzi was still asking Ford whether the doors should be shipped "finished or unpolished" on November 3rd, further indicating that the order was still not complete. DX 55.

Of course Ford had already told Talozzi the day before in an email, "These units are supposed to be 100% DONE by 11/11 so obviously the dates outlined

---

[5] Further support for this fact is found in the demand letter sent by Mobilpref's Italian counsel to Coastal, which demanded immediate payment of "160,000 Euros" owed following Mobilpref's completion of its work. PX 20.

below will not work.  Can you please set these doors up for an immediate shipment and we will take care of the finishing over here."  DX 56.  Ford had already answered the question that Talozzi asked the next day and then Talozzi never contacted Ford against until December 20, 2011.

The weight of the evidence shows that on November 3rd, with imminent closing dates, Mobilpref had not performed with respect to these missing items.  As a result, Coastal mitigated its own exposure for delay damages to Starwood if the project was not completed in time to close on units in November and December 2011.  Coastal did so by cancelling the Mobilpref shipment and retaining a new source of supply for the same doors.

Accordingly, the weight of the evidence persuasively shows that Mobilpref failed to timely ship the material in the manner that had been promised back in September 2010, starting with Mobilpref's failure to ship all of the materials by February 28, 2011, all the way up to November 2011.  The weight of the evidence also points to the fact that Mobilpref had never delivered these doors before.  Mobilpref's failure to provide the doors in a timely fashion means that the predicate for final payment of the retainage amount in paragraph 2(c) was never triggered.  Mobilpref is not, therefore, entitled to any retainage because, after being given notice more than 45 days earlier of materials not accepted or delivered, it failed to replace those missing materials within the time period required.  And because the contract provided for a type of liquidated damages that Coastal could impose, in the form of twice the value of the materials at issue, the net amount

relating to these particular materials would rise to the level of the $160,000 retainage.

Accordingly, the Court finds that the retainage amount constitutes the "damage" amount that Amendment 1 contemplated. Coastal was contractually entitle to retain that amount as compensation for Mobilpref's own breach based on its inability to deliver all the components necessary to fully complete the project. Coastal retained a substitute source of supply and relied in part on the retainage amount for this purpose.

For its part, Mobilpref takes the position that all goods were shipped and accepted by Mobilpref, thus negating any argument that payment was excused under the Uniform Commercial Code. Mobilpref argues that Coastal failed to carry its burden of proving that it rejected any of Mobilpref's goods, and, instead accepted and used all of the goods. *See* Fla. Stat. § 672.607 ("the buyer must pay at the contract rate for any goods accepted," and "[a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured. . . ."); *see, e.g., In re Holistic Serv. Corp.,* 29 B.R. 509, 512 (S.D. Fla. Bkrtcy. 1983) (debtor accepted goods shipped by creditor where evidence established that goods were delivered, debtor had opportunity to inspect and debtor failed to notify creditor of any defect within reasonable time, and only raised objections after litigation arose).

The problem is that due to the nature of the project, as confirmed by the parties in their written agreements and their course of performance, Coastal was

not in a position to put non-conforming materials back on a container to Italy, have Mobilpref inspect those materials on arrival, and wait for a new container with new materials to come back to Florida.  Instead, the parties agreed in paragraph 2(c) of Amendment 1 as to how missing materials would be handled once Mobilpref gave notice that it had completed its performance and supplied all the materials due under the parties' agreements.

The record also shows that Coastal did, in fact, provide timely notice of its general dissatisfaction of the manner in which Mobilpref shipped its goods, as well as particularly identified materials that were non-conforming and needed to be cured.  The most relevant instance of Coastal's rejection was Ital's kitchen door order.  And Mobilpref agrees that it received that notification and the list of materials identified by Coastal.  Yet Mobilpref also conceded at trial that it did not provide timely replacement materials.  As Talozzi testified, the doors were never shipped.

Hence, Mobilpref's reliance on the UCC as support for its claim for damages does not help because Coastal did in fact show that Mobilpref did not fully perform under its agreements based on missing or defective materials, which were then not timely cured after notice.   And contrary to Mobilpref's claim that Coastal's acceptance and use of the shipped materials negate its defenses to payment, these particular goods – the kitchen doors – were never used in the project by Mobilpref's own admission.  That relieves Coastal of its obligation to make payment for those materials.  *Cf. B.P Dev. & Mgmt. Corp. v. P. Lafer Enters., Inc.,* 538 So. 2d 1379

(Fla. 5th DCA 1989) ("Once goods are accepted, the buyer *must* pay at the contract rate for any goods accepted.").

In this important respect, the Court credits the testimony of Coastal's witnesses over Talozzi because their version of events surrounding the final shipment of materials were more credible and more verifiable based upon the written documentation submitted in evidence.  Talozzi, however, was not credible when it came to explaining what gave rise to the door completion order and the reasons why that order instead constituted a "new" order.

Had Talozzi's testimony been more reliable, Mobilpref would have been able to show through him or an expert that the doors at issue were precisely the ones included in the original pro forma, that they were the ones shipped on particular dates well before September, and that the September Order represented something very different.  That showing was never made.  Mobilpref relied on a global approach to the issue that relied in great deal on Talozzi's own credibility in terms of his claim that Mobilpref shipped all the materials that were required by the original order.  Because the Court was forced to reach that same conclusion largely based on the credibility of Talozzi's testimony, as opposed to a meticulous tracking of the materials at issue, the Court could not reach the same conclusion simply because Talozzi was not, in fact, credible on this point.

Further, as the emails discussed above amply demonstrate, there is a steady stream of communication between Coastal and Mobilpref from March 2011 to the end where Coastal is unambiguously giving Mobilpref notice of all of the problems, i.e., lack of flat-packing packaging as was promised by Talozzi in Italy, missing

materials, non-uniformity of materials, shipments that arrived but did not contain what was supposed to be in them, etc.  While Coastal paid Mobilpref $2,133,000 for the materials (plus $226,000 for the 12 extra units and miscellaneous items ordered in Amendment 2), there is ample evidence before the Court that Coastal did not get all that it paid for.  Mobilpref did not fully perform.  And in failing to fully perform,  it breached the Tri-Party Agreement and Amendment 1 on which it relies for its claim for payment.

Accordingly, the Court finds that Mobilpref has failed to satisfy its burden to show that Coastal breached and failed to perform with respect to the retainage amount.

Mobilpref also failed to satisfy its burden to show that any additional orders or materials were ordered by Coastal for which payment is due.  This conclusion is based on the same analysis as set forth above.  But this finding is also due to one additional reason that was not really addressed by the parties.  The door order that Mobilpref references, to the extent it was in fact a "new" order (contrary to the Court's finding to the contrary above), was made by Ital, which was still acting at this stage as the original subcontractor on the project that retained Mobilpref as the supplier.   Arguably, if the September Order was a new Order, Ital is responsible in the first instance for payment, either on a breach of contract, breach of account stated, or promissory estoppel theory.[6]

---

[6]  It is notable here that Mobilpref dismissed Ital from the case on May 18, 2015. [D.E. 55].

Arguably, Ital was then acting on behalf of Coastal when it made that Order. Thus Coastal would have been responsible for payment if it had accepted delivery of materials ordered by its subcontractor for use at in the project, either under an agency theory or an unjust enrichment theory. But, where the record shows that the goods at issue were never delivered (as admitted by Mobilpref) Coastal shares no legal responsibility for payment *even if* the doors at issue constituted a "new" order that was not already encompassed by the Tri-Party Agreement or its amendments. In this circumstance, to the extent Mobilpref has any right to recover reliance damages of any kind, Mobilpref's claim can be raised only against Ital, not Coastal.

In short, for all these reasons Mobilpref has failed to carry its burden to show entitlement on a breach of contract claim against Coastal for either the retainage amount or the separate $112,340.80 that it claims were the cost of additional materials ordered by Coastal. Mobilpref is thus entitled to no damages on its complaint. The Court finds in Coastal's favor on the complaint. Judgment shall be entered in Coastal's favor.

### B.   *Coastal Counterclaim as Assignee of Liberty Mutual*

Coastal counterclaimed against Mobilpref in its answer as assignee of all claims owed by Mobilpref to Liberty Mututal as surety for Ital's contractual obligations. Coastal's claims are asserting subrogation rights that Liberty Mutual has against Mobilpref due to Mobilpref's contribution to Ital's failure to perform under the subcontract with Coastal. As Coastal made clear in its post-trial submission to the Court, "Coastal is not seeking damages from Mobilpref for

Coastal's already paid claim, but rather Coastal is seeking recovery of Liberty Mutual's claims against Mobilpref that Coastal now owns as Liberty Mutual's assignee." [D.E. 86-1 at 73].[7]

Turning then to the count of the counterclaim that Coastal seeks to adjudicate after the trial, Count VI, Coastal contends that out of the $1,900,000 claim it submitted to Liberty Mutual, $1,151,385.91 was attributable to Mobilpref's own failures. Liberty Mutual's payment of $1,700,000 to Coastal on Ital's performance bond purportedly was due to these failures, for which Coastal, as assignee of Liberty Mutual, seeks damages against Mobilpref. Specifically, the counterclaim alleges that "as a direct and proximate result of Mobilpref's breaches of its agreement with Ital, Ital suffered damages, which claims Liberty Mutual became subrogated to upon making payment to Coastal on the performance bond claim." [D.E. 23 ¶38].

As to the nature of those breaches between Ital and Mobilpref, the counterclaim alleges that "Mobilpref breached its agreement with Ital by failing to timely deliver the materials, delivering the materials without proper labeling, missing pieces, broken pieces and incomplete shipments[,] and overbilling Ital for materials which were not shipped and delivered." [D.E. 23 ¶37].

---

[7] Coastal's original counterclaim also included personal claims, separate and apart from Coastal's standing as assignee of Liberty Mutual's subrogation rights, against Mobilpref. Specifically, Mobilpref sued Mobilpref for breach of contract (Count I), fraud (Count II), fraud in the inducement (Count III), negligent misrepresentation (Count IV), and unjust enrichment (Count V). Based on Coastal's stated position post-trial, it is plainly clear that Coastal abandoned those personal claims against Mobilpref. Judgment shall thus be entered against Coastal on those counts and no further analysis of their merit (or lack thereof) is necessary.

## 1. Standing

Mobilpref's first response to this claim is that it fails as a double recovery for Coastal.  Mobilpref argues that Coastal cannot receive a double recovery under the election of remedies theory because the ultimate remedy it seeks here is the same as the remedy it already obtained from Liberty Mutual.  Hence, Coastal's claim to damages against Mobilpref has been satisfied and/or extinguished.

On this preliminary issue, Coastal's claim in Count VI as assignee for Liberty Mutual is on firm legal footing.  When a surety is called upon to perform on its suretyship obligation and does so, it becomes subrogated to the rights of its principal (Ital) for any remedies or securities that would otherwise belong to the principal. *Continental Casualty Co. v. Ryan Incorporated Eastern,* 974 So. 2d 368, 376-77 (Fla. 2008) ("Equitable subrogation has been defined as 'the substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor.' . . . In the context of a surety relationship, the key to equitable subrogation lies in the surety's right to indemnification.  Because a surety who pays a judgment on behalf of its principal is entitled to indemnification by its principal, it has the right to be subrogated to any rights the principal has. . . .").

In the context of a construction contract, a common form of equitable subrogation well established in Florida and elsewhere is the surety's claim, on behalf of a contractor/principal, against subcontractors that defaulted on their own obligations owed to the contractor.  *See, e.g., Wilcon, Inc. v. Travelers Indem. Co.,* 654 F.2d 976, 987 (5th Cir. 1981) ("When [the surety] completed the ... project upon

the default of the [principal] and pursuant to its bond obligations, [the surety] became subrogated to all of the rights and remedies of the [principal] against defaulting subcontractors."); *Travelers Indem. Co. v. Peacock Const. Co.,* 423 F.2d 1153, 1156 (5th Cir. 1970) ("[U]nder the most rudimentary principles the surety succeeds to its principal's right to payment upon completion of the contract.").

Here, Liberty Mutual, as Ital's *performance* bond surety, paid $1,700,000 to Coastal on Coastal's performance bond claim. That undertaking as a performing surety granted Liberty Mutual the broadest possible scope of subrogation, which encompassed any remaining contract balances (of which there were none), as well as the right to recoup the loss it was obligated to pay on Ital's behalf to any contributing wrongdoer. Thus, contrary to Mobilpref's position, Coastal is not seeking to recover monies that it has already been paid, but rather asserts a claim as the assignee of the party who possessed the right to seek damages from Mobilpref prior to the assignment, Liberty Mutual.

### 2. *Mobilpref's Liability*

Moving past that preliminary question, we proceed to adjudicate the rights that Coastal is enforcing as assignee of Liberty Mutual. Coastal has asserted that Mobilpref breached its contractual obligations to Ital by failing to timely and properly deliver materials necessary for completion of Ital's contract with Coastal. Coastal's claim fails, however, based upon its inability to meet its burden of proof as to the elements of a breach of contract between Ital and Mobilpref.

For starters, it is important to remember what Ital's claim against Mobilpref is that Coastal is pressing as assignee of Liberty Mutual. Ital's claim is alleged to

be a breach of contract by Mobilpref.  The elements for such a claim are the same as those that Mobilpref undertook:  "Under Florida law, a breach of contract arises when there exists (1) 'a valid contract'; (2) a 'material breach' of that contract; and (3) resulting 'damages.'" *Energy Smart,* 660 F. App'x at 862 (quoting *Beck,* 175 F.3d at 914).

As to the first element, the underlying contract between Ital and Mobilpref, the evidence is surprisingly lacking.  The Court's review of the extensive record in the case shows that any master contract between Ital and Mobilpref was never admitted into evidence, nor was the detail included in Ital's purchase order.  The record contains only the terms of the pro forma that Mobilpref prepared in response to Ital's order as well as the invoices and records of shipment that Mobilpref delivered to Ital. PX 14, 21.  The record evidence thus is missing critical components of a traditional breach of contract claim – the precise terms of the parties' agreements to one another.

The testimony at trial, of course, supplied overwhelming evidence of the existence of such a contract and Mobilpref's performance under that arrangement.  But what was still lacking was any testimony from any Ital representative as to the precise terms of that original arrangement, the parties' understanding as to how Mobilpref had agreed to perform its obligations to Ital, or even the manner in which that performance was carried out.  The witnesses who testified at trial were only representatives of the parties themselves, Mobilpref and Coastal.  But Ital was completely absent from this trial.

As between Mobilpref and Coastal, of course, that would not be surprising. But Coastal is standing in the shoes of Liberty Mutual, which is entitled to equitable subrogation on behalf of Ital. Ital's role is central to that equation. Yet the Court heard zero testimony from Ital as to any of the issues personal to Ital. That failure to have a complete record in this respect makes Coastal's claim, on Liberty Mutual's behalf, that much more difficult.

But, at minimum Coastal clearly established that Mobilpref agreed to manufacture and deliver materials for the St. Regis project. That much is clear. Yet the record also shows that, with the exception of certain materials that were addressed above with respect to Mobilpref's own damage claim, Mobilpref delivered the materials and components that Ital ordered for its contract with Coastal. So failure to deliver at all cannot be a source of a finding of a breach or damages for purposes of the counterclaim.

The record also contains evidence of Mobilpref's agreements to perform set forth in the Tri-Party Agreement and Amendment 1. But performance under those agreements was also shown to have been completed, again but for certain doors and other missing parts necessary to complete installation of the kitchens. And as far as Amendment 2, there was no evidence that shipments of those additional materials did not take place.

That leads us then to the question whether Mobilpref breached those agreements in other ways. Specifically, Coastal presented evidence though its own witnesses that Mobilpref delivered the materials in an untimely fashion and in a manner that made it unnecessarily difficult to assemble and install the parts into

the St. Regis units.  But there is a failure of proof in this aspect of the claim as well.  Coastal failed to designate an expert witness at trial to provide causation or damage testimony. Instead, it sought to substantiate its damages through the lay opinion testimony of Thomas Driscoll. At no time during his work on the Project or in the three years after did Mr. Driscoll ever attempt to record the details of his work or the work of others on the Project to allocate what work, materials or services were attributed to some alleged fault of Mobilpref.

Indeed Mr. Driscoll admitted at trial that he performed his valuation opinion of responsibility in 2015, years after the Mobilpref work was performed and well after this litigation began.  T.IV-773.   And Coastal's counsel conceded that Mr. Driscoll performed this after-the-fact allocation only after Mobilpref requested discovery going to damages under the counterclaim.  So the long and short of it is that the evidence in this record is based on Coastal's self-serving estimates and re-allocations performed by one of its employees and admitted into evidence as lay opinion testimony.  To be sure, the Court, over Mobilpref's objections, permitted this testimony into evidence (along with the supporting third-party invoices and receipts) but reserved the right to assess its weight as factfinder.

That assessment of the weight to attribute to this evidence proved to be quite difficult.  The Court extensively re-reviewed Mr. Driscoll's testimony and the materials that his testimony relied upon.  Mr. Driscoll's damage analysis assigned specific costs of materials and services for dozens of suppliers, vendors, independent contractors and employees of various companies involved in the Project over an eighteen month period of time.  But the suppliers, vendors,

employees and contractors worked at widely varying times and at least two different locations. It is not possible to fully credit Mr. Driscoll's conclusions with respect to the necessity of their work juxtaposed against Mobilpref's performance under its contract with Ital.

For example, Mr. Driscoll allocates 50% of each of his own invoices to Mobilpref's improper acts or omissions. Specifically, based on the summary, Mr. Driscoll opines that every one of his invoices to Coastal were 50% attributable to Mobilpref. DX 61. According to the summary and Mr. Driscoll's testimony on his invoices, over an eighteen month span there was never a day where his time was either more or less than 50% attributable to Mobilpref; instead, his work on any given day was always exactly 50% attributable to Mobilpref. But Mr. Driscoll did not testify as to any of his specific invoices, and he never substantiated that what he was doing on any specific day was attributable to Mobilpref. Perhaps that is because Mr. Driscoll's timesheets do not contain any description of what work he did on a given day. Mr. Driscoll also did not keep a contemporaneous ledger of what activities or costs were believed to be attributable to Mobilpref.

Thus Mr. Driscoll's lay opinions are entitled to little weight because they are not adequately supported in the record. Mr. Driscoll's allocation is not substantiated by firsthand experience, is not entirely plausible, and lacks trustworthiness given the manner in which he prepared his estimates.

The Court instead finds that, based on the testimony and evidence that was introduced at trial, the necessity for Mr. Driscoll's work at the project was due mainly to Ital's failure to perform the most essential tasks that it contracted to

perform.   Ital's responsibility on such a large project had to have included the retention of many employees to review, sort and distribute the component parts that Mobilpref was delivering.   Ital was responsible under its agreement with Coastal to "provide project management expertise in the coordination of this [project]"; to "coordinate deliveries with the Project Schedule" and maintain "offsite storage costs" for that purpose; to "furnish and install" all required cabinetry for all units; to "provide complete shop drawings that show all required installation details"; to "provide all necessary adjustment of doors, hardware, cabinets, vanities, etc. in order to offer a completed and satisfactory product to the Owner"; to "touch-up damaged cabinets, as necessary, and to replace cabinets if damage cannot be concealed or remediated" and "expedite delivery of products" for this purpose; and to "provide sufficient manpower to properly perform required punchout work, which includes supervision provided by [Ital] dedicated to this aspect of the Project." DX 2, Exh. A at 1-9.

The record instead showed very little evidence of what Ital's own employees were doing from the beginning of the project through its conclusion.   Isolated snippets of testimony reveal an Ital employee trying to complete a task.   But the record also shows that Coastal's own workers, including Mr. Driscoll, were taking on a greater and greater share of responsibility at Ital's facility precisely because Ital was not completing its scope of work on the project.   Indeed given the size of this contract and the scope of work involved, Ital would have been required to amass a small army to undertake the type of work it agreed to perform.   The record at trial barely had evidence of a platoon, least of all an army.

So, faced with this record, it is just as equally plausible to find that the majority of the work that Mr. Driscoll was required to perform to facilitate completion of the Project on Coastal's behalf was attributable directly to Ital's failure to perform.  After all, Mobilpref was only contractually responsible for manufacturing goods and shipping them to Miami.  Ital was in charge of what would happen to those goods after they got there.  Coastal was forced to retain Mr. Driscoll to take on responsibilities that Ital had contractually agreed to perform. Attributing 50% of that work to Mobilpref, the entity that delivered 40 shipping containers' worth of product under its contract, belies common sense and is not supported by the record Coastal developed at trial.

And what is most telling is that the greatest "breach" of performance of any portion of this contract occurred before Mobilpref delivered its first component. Ital's failure to initiate payment that Ital owed to Mobilpref at the early stage of the project was a critical failure to perform that undermined the entire project. After Ital entered into its contract with Coastal, at an initial cost to Coastal of $3,000,000, it was tasked with preparing the order, submitting it to Mobilpref, and depositing the initial monies with the subcontractor to initiate manufacture.  Yet, as Coastal's own witnesses explained, Ital failed to do that, which failure lead to months and months of delays.  Only after the Tri-Party Agreement was signed and Coastal fronted those initial monies to Mobilpref did Coastal begin to receive the necessary goods.   Coastal had been expecting to see delivery commence in September 2010.  That did not occur.  But the record shows convincingly that it was not Mobilpref that failed to perform at this early stage, but rather Ital.

Compounding matters, Ital *again* failed to materially perform after shipments began to arrive when, despite its original contract obligations that were reincorporated into the Tri-party Agreement, Ital did not make the required payments to Mobilpref that Ital had committed to. This second round of non-performance caused further delays in completing the shipments in March 2011, and ultimately led to Amendment 1 of the Agreement and additional disbursements of monies directly from Coastal to Mobilpref.

These multiple material breaches on Ital's part played a recurring central role in all the problems that followed. Because of the initial material delay in starting production and the delivery of product, the kitchen/closet project was severely prejudiced. The plan projected a completion date in the summer of 2011, well in advance of the closing dates that would follow in the fall by which time certificates of occupancy were due. Despite Coastal's best efforts, the project never really got back on firm ground in time to complete the units as scheduled. Substantial work continued well into the late fall of 2011, even as closing dates were imminent. This added a substantial amount of pressure to all the workers and installers laboring on the project, which pressure undoubtedly resulted in a slew of problems with each kitchen and cabinet installation. Though it may also be accurate to state that individual shipment delays or packaging issues compounded matters, the weight of the evidence shows that – for a project this large – it was materially hampered by non-performance that occurred back in 2010, and then again in the early part of 2011. These contractual breaches were attributable entirely to Ital. Yet, Mr. Driscoll's analysis assumed that Ital and Mobilpref were

on equal footing for the many failures that led to the delays in completion.  That conclusion is simply not credible given the weight of the evidence.

The weight of the evidence also shows that, after Ital failed to perform initially on its contractual obligations to Coastal, Coastal was well aware of that breach.  But Coastal did not immediately replace Ital and find a substitute contractor.  Instead it sought to facilitate Ital's performance.  Ital's representative was thus asked to travel to Italy on Coastal's first trip in September and be present for Coastal's inspection.  Nevertheless, Coastal was again disappointed in Ital's performance when, a few months later, Ital's promised delivery of the first container turned out to be a ruse.

It was after these multiple failures to perform that Coastal agreed to enter into direct negotiations with Mobilpref, which negotiations led to the Tri-party Agreement.  But Ital remained an essential party to the project.  Ital signed the Tri-Party Agreement.  Ital did not enter into a new agreement with Coastal to minimize its role.  Instead Ital agreed to perform its share of the original contract if Coastal made the $1,500,000 payment to Mobilpref (after having paid Ital $3,000,000 months earlier).  Coastal thus chose to maintain Ital as the principal responsible party tasked with assembling the manufactured parts, sorting them, and rejecting any goods that did not live up to specifications.  That essential responsibility – the "project management expertise in the coordination of this Scope of Work" – continued throughout the end of the project.  That was Ital's responsibility, not Mobilpref's.

Yet, notwithstanding that critical role, there is no evidence from Ital or Coastal that any specific goods were rejected for months after delivery ensued. Ital did not give written notice to Mobilpref of any defective parts, nor did it place any orders for substitute components until months later – September 2011. So for months Mobilpref delivered components and the buyer – Ital/Coastal – accepted them. But all the while Ital was failing in its obligation to sort and assemble the delivered material in a manner that would facilitate their installation at the project. It failed in its contractual obligation to timely reject any materials after shipment to assure their replacement on schedule. After all Mobilpref did not have its employees working at Ital's facility, Ital did. Ital was responsible at all times for adequately manning their facility with all the workers necessary to complete its obligations for the project.

Indeed one of the responsibilities that Ital would have needed to perform in the ordinary course of this project is refinishing work that may have been necessary after product arrived from the manufacturer. That work may have been due to imperfect manufacturing, but it could also have been necessary due to failures in the installation process. Under paragraph 1.3.39 of the subcontract, Ital was responsible for touching-up any damaged cabinets and to replace those cabinets, if necessary, if such damage could not be remediated. DX 2, Exh. A at 5. Yet, Mr. Driscoll's lay opinion was that 100% of the *$837,406.02* in refinishing costs that Coastal incurred were attributable to Mobilpref, even though he did not attest that he saw all of the material that was refinished or witness all of the refinishing work as it occurred. He could not have seen firsthand that 100% of the refinishing

was attributable to Mobilpref.  There is thus no record basis for us to determine what percentage of the material needed refinishing because it arrived at the project in a defective condition, versus what percentage needed refinishing because it was damaged at some point during the sorting and/or installation process.  If it was the former, Mobilpref would be responsible.  If it was the latter, Ital would be most responsible.

But the Court cannot reach a definitive conclusion one way or the other where the record contains no contemporaneous, product-based rejection of delivered goods as they were being shipped.  Instead the Court was presented with global after-the-fact assessments of Coastal's own employees that attributed every single refinishing cost to Mobilpref.  Faced with that take it or leave it choice, the Court chooses to leave it.  The evidence does not meaningfully allow for a reliable finding that Mobilpref substantially contributed to a particular amount for refinishing work that Coastal incurred at the project, and especially not for 100% of all the refinishing that may have been required.

Other costs included in Coastal's calculations meet a similar fate.  Coastal attributes $195,255 to Mobilpref for the overall $293,000 Coastal spent for additional labor and distribution costs at the Ital facility, which represents 66% of the total figure.  Coastal argues that these additional costs were incurred as a proximate result of Mobilpref's failure to deliver and ship the product in the manner in which it promised to do using pre-assembled flat packs that would facilitate installation of the necessary parts at the project site.

The problem is that the Court was presented with zero evidence that Mobilpref's agreement with Ital encompassed a binding commitment to deliver the product in any particular manner. We do not even have any testimony from an Ital representative that could attest that Mobilpref agreed to deliver the materials in a specific fashion so that Ital could then undertake its distribution and installation responsibilities. The record also contains no definitive representations from which we could find that Ital or Coastal relied to their detriment. After all, Coastal's employees confirmed at trial that they realized that product would be delivered from multiple locations as Mobilpref was itself only manufacturing the melamine components.

Without binding commitments from Mobilpref's part that we can attribute as a condition of Ital's performance, it is not possible to find, as Coastal contends, that 66% of the added labor cost at Ital's facility was attributable to Mobilpref. Nor can we find that any particular percentage of the labor cost was attributable to Mobilpref without a more specific showing that particular shipments or containers failed to meet Mobilpref's contractual obligations. We were presented with only a broad-brush theory that Mobilpref failed to live up to Coastal's expectations and, therefore, 66% of the added cost that Coastal incurred at the Ital facility can be linked to this disappointment.

That showing does not come close to Coastal meeting its burden to show that Mobilpref's non-performance was a proximate cause of Ital's own failure to perform under its contract with Coastal. Under Florida law to make such a finding the Court would have to be presented with evidence that Mobilpref's own non-

performance was a substantial factor in the equation.  *See, e.g., Cedar Hills Props. Corp. v. Eastern Fed. Corp.,* 575 So. 2d 673, 678 (Fla. 1st DCA 1991) (citing 5 *Corbin on Contracts* § 999 (1964) ("To establish liability the plaintiff must show that the defendant's breach was a 'substantial factor' in causing the injury.")); *Tuttle/White Constructors, Inc. v. Montgomery Elevator Co.,* 385 So. 2d 98, 100 (Fla. 5th DCA 1980) (trial court erred in setting aside possible delay damages against contractor due to other subcontractors' role in contributing to breach where evidence showed that only contractor's delays were a substantial factor in causing the injury).  The evidence in this record does not allow for such a finding as against Mobilpref, at least with respect to the vast majority of product it delivered.

The Court can find that with respect to some replacement doors and parts ordered in September 2011, Mobilpref did not perform. But that fact was taken into account in relation to Mobilpref's demand for final payment of the retainage amount and additional monies purportedly due for these orders.  The Court has sustained Coastal's defense to that claim that the retainage amount need not be disbursed given Mobilpref's limited failures to perform.  But the same cannot be said with respect to the vast amount sought by Coastal, on Liberty Mutual's behalf, that requires the Court to find that Mobilpref materially failed to perform despite shipping 40 containers of product over a ten-month period.  The weight of the evidence in this case does not allow the Court to find that Mobilpref's non-performance was a substantial factor that contributed to Ital's multiple and repeated failures to perform under its subcontract with Ital.  *See also RDP Royal Palm Hotel, L.P. v. Clark Const. Grp., Inc.,* 168 F. App'x 348, 354 (11th Cir. 2006)

("The record shows that some delays were caused by [GC's] subcontractors, but those delays *did not substantially postpone* the eventual completion of the Resort. Rather, the substantial delays which severely impacted the Resort's construction . . . were all attributable to [developer] and not the fault of [GC's] subcontractors. Although [developer] asserts that the district court erroneously failed to apportion the total delay among the contributing parties, we find no error because [developer] has not established a reasonable basis for such apportionment nor shown that apportionment was required.") (emphasis added); *Gesco, Inc. v. Edward L. Nezelek, Inc.,* 414 So. 2d 535, 538 (Fla. 4th DCA 1982) ("Although the record demonstrates, and the trial court found, that [GC] was responsible for some of the delay, the court was nevertheless correct in concluding that [developer's] evidence did not establish a reasonable basis for apportioning responsibility for the total delay.").

Finally, even if Coastal had shown that Mobilpref's non-performance was a substantial factor, Coastal would still have to prove an amount of damages that could remedy an injury suffered as a proximate result of the breach.  *E.g., Tuttle/White Constructors,* 385 So. 2d at 100.  And to do so Coastal would have to show that the extent of those damages can be proven with reasonable certainty. *E.g., Nebula Glass Int'l, Inc. v. Reichhold, Inc.,* 454 F.3d 1203, 1212 (11th Cir. 2006) (" 'Under [Florida's] certainty rule, which applies in both contract and tort actions, recovery is denied where the fact of damages and the extent of damages cannot be established within a reasonable degree of certainty.' ") (quoting *Miller v. Allstate Ins. Co.,* 573 So. 2d 24, 27-28 (Fla. 3d DCA 1990), and citing Restatement (Second) of Contracts § 352 (1981); Restatement (Second) of Torts § 912 (1982)).

Coastal has failed to do that in this record.   The amount of damages requested bears little connection to the actual amount of losses that could fairly be attributably in fairness to Mobilpref.   And assuming there was some level of loss that Mobilpref substantially caused, the amount cannot be determined with any degree of reasonable certainty because we have no way to connect the dots.   The shotgun showing that Coastal presented at trial is not a fair substitute for a specific showing that particular items of damage or delay were substantially caused by a particular defective component or a particular delay in its shipment.

Coastal would argue that given the volume of product delivered for this project it would be practically impossible to make such a showing, even though any reasonable person can see that Mobilpref failed in its duty to substantially perform. But Coastal forgets that Mobilpref *did* substantially perform on its obligation to manufacture product and ship that product to Florida.   Ital was the installer and the party responsible for project supervision over the entire operation.   The great bulk of the problems that Coastal identified at trial can be tied directly to Ital's breaches of its performance obligations. To add Mobilpref into that equation, Coastal (as assignee of Liberty Mutual) has the burden of showing with some reasonable degree of specificity that Mobilpref's failures rose to the level of a legally sanctionable breach of its contractual obligations.   For the most part, it simply could not accomplish that fundamental task.

In sum, Mobilpref did not perform ideally in many different ways.   It contributed to delays in the project, made it difficult for the installer to perform more efficiently, which compounded the installer's ultimate failure to perform.

Troubled as it was, however, Mobilpref's performance cannot be found to have substantially contributed to that failure.  And any damages that Mobilpref may have contributed to in particular cannot be identified with any reasonable degree of certainty or confidence.  The Court is left to speculate what that amount would be, but a breach of contract remedy cannot be imposed on sheer speculation.  The weight of the evidence, therefore, shows that Liberty Mutual, as subrogee of its principal Ital, is not entitled to any material contribution from Mobilpref for the woefully deficient performance of its principal, Ital, on this project.

Accordingly, Coastal as assignee of Liberty Mutual is not entitled to any damages on its counterclaim.  The Court finds in Mobilpref's favor on the counterclaim.  Judgment shall be entered in Mobilpref's favor.

* * *

### III.   CONCLUSION & FINAL JUDGMENT

Based upon the foregoing Findings of Fact and Conclusions of Law, it is

**ORDERED and ADJUDGED** that:

1.     Final Judgment is hereby entered in favor of Coastal Construction of South Florida, Inc., and as against Mobilpref, SpA, as to all counts of the complaint.  Mobilpref, SpA shall take nothing on the complaint.

2.     Final Judgment is hereby entered in favor of Mobilpref, SpA. as to all counts of the counterclaim, and as against Coastal Construction of South Florida, Inc.  Coastal Construction of South Florida, Inc. shall take nothing on the counterclaim.

3.     This case is now CLOSED.

**DONE and ORDERED** in Chambers in Miami, Florida, this 1st day of March, 2017.

EDWIN G. TORRES
United States Magistrate Judge